Good morning, Your Honors. Deputy Attorney General Oliver Wu on behalf of Defendant Appellant, and I would like to reserve two minutes for rebuttal. Sure, just keep an eye on the clock. The district court incorrectly denied summary judgment to four defendant mental health professionals based on nothing more than a difference of medical opinion. None of the defendants were deliberately indifferent to Mr. Campbell's mental health needs, and all of the defendants are entitled to qualified immunity because it is both categorically available and because the law was not clearly established. I am going to start with the deliberate indifference claim about Becara, Dr. Martin, and Dr. Kenton before discussing qualified immunity and then ending with Mr. Herrera. Unless the court has any other issues that it would like me to address first. Becara, Dr. Martin, and Dr. Kenton made reasoned assessments of Mr. Campbell's suicide risk based on the evidence available to them, the mental health record at the time, and their observations of Mr. Campbell through their one-on-one interviews. However, the district court denied summary judgment, relying only on plaintiff's expert's report. But that report represents nothing more than a difference of medical opinion, and a difference of opinion is not enough to defeat summary judgment on a deliberate indifference claim. So you would agree, wouldn't you, that we take the evidence in the light most favorable to the nonmoving party? Is that right? Yes, Your Honor. So don't we have to take all of the allegations that the plaintiff makes here basically is true for purposes of this proceeding? That is correct, Your Honor. That's what we have to do, right? Yes, Your Honor. Now, we have the expert's declaration, and there wasn't a counter declaration by the State that was submitted at summary judgment. Is that right? There were declarations submitted by the defendants. No, I mean, I should say, I apologize, a counter-expert declaration. There was not. Okay. So we have all that evidence with the expert. And it seems like when you look at the evidence in the light most favorable to the plaintiff, that one could say that a reasonable jury could find a constitutional violation. I have two responses. Okay. So while the court is correct that the evidence must be taken in the light most favorable to Mr. Campbell, the underlying material facts are not in dispute. There is no dispute over what happened. The medical records are all the same, are being used are all the same. The difference here is that Mr. Campbell's expert has a different interpretation of what happened on that day or interpretation of how the defendant should have acted. But a difference of medical opinion in a deliberate indifference case is not enough to overcome that bar. Simply pointing out that someone else would have done something. Can we say that, though, on this record as a matter of law? Yes, Your Honor. And looking at the cases that plaintiff and the court cited, the district court cited, to support its ruling demonstrates a difference. For example, the district court cited Oclithia v. City of Contra Costa. And in that case, the patient's clinician told the defendant mental health worker that the patient was at a high risk of suicide. The defendant mental health worker also agreed that the patient was at a high risk of suicide, stating that they were not yet out of the woods. Despite all of those conclusions, the defendant released the patient in Oclithia from suicide watch. But in this case, every single mental health professional that actually treated Campbell agreed that he was at a low acute risk of suicide. When you say they had a difference of medical opinion, are you saying that at least some of them thought that his claim that he tried to commit suicide by cell extraction wasn't credible? Is that the – Not quite, Your Honor. I think it's less about – sorry. It's less about credibility but more the question of whether they felt he was at an acute risk of suicide, whether they felt that he was going to try to commit a lethal suicide attempt. And so in this case, based on the evidence available to them, they did not believe that Mr. Campbell presented as suicidal. And, in fact, after the third cell extraction, when Mr. Baccarat interviewed Campbell again, the treatment team concluded that Campbell was likely homicidal, that he was trying to pick a fight with the correctional officers because he wanted to hurt them. And so they eventually moved him into a crisis bed based on that violent and unpredictable behavior. But ultimately, during this period of time, the defendants all agreed, every mental health professional agreed, that Mr. Campbell was not at – had a low acute risk of suicide. And they didn't make these conclusions in isolation. But for – at least for Officer Becerra, it seems like he might be in a different bucket because he was told repeatedly that there might be – tried committing suicide by cutting, by hanging. He had a lot more interactions here. And maybe he was put on more notice, really. And when he was transcribing the forms and putting information in the forms, it seems like he minimized it every single time. So in some ways, he's in a different position than someone, the Kenton, who maybe had just very minimal contact. Not exactly, Your Honor. So to clarify, the expert report mentions prior suicide attempts. In the June 17 treatment plan, they actually noted that attempt, and it was a hunger strike that occurred many months earlier. And so the expert disagreed with the defendants on how to characterize that hunger strike. But again, that's a difference of medical opinion, not a disputed material fact precluding someone's judgment. And in any case, the way that this – Well, let me ask you this. The plaintiff probably couldn't prove his case without an expert, right? That might be true, Your Honor. But at the same – That would be pretty hard. I mean, you know, it's kind of – you know, as somebody who's not skilled or knowledgeable in the psychological area of, you know, suicide, it seems like one would need an expert to offer an opinion.  That's true, Your Honor. But the record still has to reflect that a reasonable mental health professional, that the actions they took were medically unacceptable. And deliberate indifference is a high bar. It is much higher than negligence, and it requires something more. Your time is clicking down. Why don't you turn to – Okay, let's assume, let's just assume for a moment that there's a constitutional claim here. Yes. You argue that each individual defendant is entitled to qualified immunity. So why is that so in light of culture?   Yes. So the district court relied only on Cluthia to deny qualified immunity. But the court framed the question as whether reasonable mental health professionals would have – would not have removed key suicide prevention measures put in place by other mental health staff. But that framing of the question demonstrates why qualified immunity is – my defendants are entitled to qualified immunity. There were no suicide prevention measures put in place by any mental health staff. And so the framing of the constitutional issue simply doesn't match the facts of this case. And for qualified – and under the second problem, qualified immunity, the court has to identify a constitutional right that was clearly established and particularized to the facts of the case. And so for that reason, this court can grant qualified immunity to defendants, even if it finds that those are disputed back on the deliberate indifference question. Well, let me ask you this. The district court – I read the colloquy that took place on the motion for summary judgment. And the district court seemed to indicate or was of the view that the claim that they raised here just fell right within the parameters of culture. And, you know, why was he so off base in your view? Well, the framing of the question simply doesn't match the facts. Like I mentioned – That's it? He just framed the question incorrectly? Yes, Your Honor. And that's critical because for the law to be clearly established, the question must be particularized to the facts of the case. And what happens here, the dispute here, is whether Mr. Campbell was entitled to a particular protocol or application of a suicide evaluation. But, you know, just as the Supreme Court has told us we can't frame the question too broadly – I mean, I particularly singled this out – to generally, by the same token, if you frame the question to map out exactly all the facts, then what you're saying is you have to have a specific case on all fours before you can say that somebody is not entitled. It doesn't have to be on all fours. Entitled to qualified immunity. Right. I mean, the court hasn't gone that far. The court says, you know, you just can't frame it so broad. That's correct, Your Honor. It doesn't have to be on all fours, but there certainly has to be some connection. And every aspect of the constitutional issue the district court identified is simply inaccurate, does not match the facts. There were no key suicide prevention measures put in place by any mental health staff. And so from that basis alone, this court can grant qualified immunity. Maybe just for the law. I do have a question. The district court found or held that there is a genuine issue of dispute whether defendants Becerra, Martin, Kenton, and Herrera purposely failed to respond to plaintiffs' serious mental health needs, which resulted in harm. That's sort of a higher standard than deliberate indifference. He's saying they knew, he found that they knew they had a problem and they purposely did nothing. That there's a genuine dispute as to that. That's a much higher standard than deliberate indifference. That might be, Your Honor, but the district court relied only on the expert's report, which is just a difference of opinion. And I noticed that about every time. Why do you say it's just a difference of opinion? You don't have an expert. That's correct, Your Honor. But the defendants themselves are also knowledgeable about the mental health process and relied on their own expertise in making their declarations. Thank you, Your Honor. We'll give you some time for rebuttal.  Good morning, Your Honors, and may it please the Court. My name is Thatcher Hoke, and I represent Mr. Campbell, and I'll be discussing the constitutional violation in my co-counsel Sinpuri and Fong. We'll be discussing the second prong of qualified immunity. Go ahead. So, first, I want to address a couple of points that were raised by the other side. First, this does not represent a difference of medical opinion. I would highlight that not every decision taken by a medical professional is an appropriate exercise of medical opinion. And for purposes of summary judgment, the defendants did not dispute that Campbell had a serious medical need, and he suffered physical harm as a result, which was his head wounds from the cell extractions. And there's a genuine dispute as to whether the defendants were knowledgeable of Campbell's elevated suicide risk at the time that he was under their care. And here, our experts showed that the course of treatment chosen by each defendant was medically unacceptable under the circumstances, and they intentionally ignored or mischaracterized several key risk factors, including Campbell's prior history of suicide attempts, his medical history, the fact that he subjected himself to multiple cell extractions, and his refusal to take his medication. And so their decision not to recommend suicide prevention care could be found by a reasonable jury. Is suicide by cell extraction, is that a common thing? I know, obviously, we've heard of things like suicide by cop, where someone aggressively approaches an officer who's armed and wants to commit suicide that way. But is suicide by cell extraction a thing? Because cell extraction is common. A lot of times prisoners, because they want to protest something, they want their property back, they don't like certain things that are happening to them, they'll board up their cells, they'll put up their mattress, sheets, or whatever it is, and they get extracted. What I'm trying to get at here is, would some of these officers think when he boarded up his cell, think that's not a suicide attempt, but rather he's complaining about something? Yes, and I believe it is a fairly common thing. I know that Mr. Campbell himself characterized his intention as being to kill himself when he was boarding up his cell. But we would look at it from what a reasonable officer would do here in this situation. And would they view this as, OK, here is a prisoner who doesn't like a certain policy or something that's happening to him, so he's protesting this, and wouldn't view that as a suicide attempt? Yes, I take your point. And I think we did mention a couple of cases, I believe, from the Northern District in our briefs that address this, and the cell extraction being a recognized way of attempting suicide. And I think also what's important to note here is that Campbell told Kenton and Martin that his intention was to commit suicide by cell extraction, and so... Counsel, I don't understand the cell extraction concept. So how does that end up in his death? So I think it's comparable to the suicide by cop, where he's boarding up his cell. He knows that a group of officers are going to seek to extract him, and so he's anticipating a violent reaction to boarding up his cell. And so I think especially with what our expert highlighted as well about the treatment of Campbell, I think that goes to show that at least there's a reasonable inference to be drawn there that the medical professionals would have known that he was attempting suicide by doing so, and that he had told them he was suicidal before that happened and after. Let me ask you this. How does Herrera fit into this? He seemed to be just a technician who was delivering meds and had a particular responsibility in the way in which he was to record the delivery of the medications. He had a form he had to fill out. So what did he do wrong? What constitutional right did he violate? There are two distinct issues with Herrera, which are his failure to report Campbell's statement of suicidal intent to the prison health staff and his failure to report Campbell's refusal to take his medication. And to answer your question, we believe that both of those give rise to a reasonable inference that he was deliberately indifferent in providing care to Campbell. And how, though? So, first, our expert for reporting... Is there any sort of policy statement or, you know, protocol that he's supposed to follow that he didn't follow? Yeah, so for reporting the suicidal statement, our expert noted that he directly violated the CDCR policy that requires all employees to immediately notify health staff if they become aware of an inmate's suicidal ideation, and that's in the record at ER 167. And so he himself confirmed that he reports to custody staff every time an inmate tells him that he feels suicidal. And so beyond the specific policy, I think also a primary goal of the mental health practice is preventing suicide, so the fact that there was no follow-up at all to his statement gives rise to a reasonable inference that he was deliberately indifferent. And I'll yield the rest of my time to my co-panelists. Good morning, Your Honors. My name is Sinporian Fong, and I, too, represent Mr. Campbell. Your Honors, the riot issue in this case is that when a mental health professional knows that their patient has a substantial risk of committing suicide, they cannot be deliberately indifferent in providing adequate suicide prevention measures. This right was clearly established in 2010 in this court's case, Clottier v. County of Contra Costa. Your Honors, the defendants had noted or suggested that this case doesn't stand on all fours with the defendants here, but we believe it specifically stands on all fours when it relates to Kenton and Martin, who did remove suicide prevention measures that were put in place after Mr. Campbell had the cell extractions take place. However, what was crucial to the holding of Clottier was that the clinician there had substantial knowledge that Clottier was suicidal based off of his medical records as well as the direct encounters with past physicians related to how he was suicidal. But here there is substantial knowledge by all defendants that Mr. Campbell was suicidal, as my co-counsel had previously discussed. So we believe that Clottier is most applicable here in suggesting that the right or that to the defendants that their actions were clearly unlawful. So let me ask you this. What should a reasonable mental health worker in a prison situation take from Clottier? That if they have knowledge that there's a substantial risk of that the patient's committing suicide, they should provide adequate suicide prevention measures. So in the case of Kenton and Martin, they should have continued those suicide prevention measures that were already existing. In the case of Hera, he should have immediately notified a health staff member that Campbell had noted that he was suicidal. And for Becerra, he should have done elevated care a lot sooner. However, he continually ignored... Now, when you look at what they did, they did interview him, correct? Kenton and what was the other fellow's name? Martin.  They're both psychologists, right? Yes, Your Honor. They did. Each one of them interviewed him or met with him? For a brief period of time, yes. And I gather they looked at his records? Or do we know? Yes. He did? He did. Okay. And so then they formed an opinion about what care he should receive, right? Yes. But it is our opinion that they were being deliberately indifferent in the care that they provided because they ignored the symptoms that he was provided. Specifically, he had those recent cell extractions the night before and his medical records suggest that he was at risk of committing suicide continuing. Right. At least, though, for the constitutional violation, it seems like your expert witness is critical. Yes, Your Honor. You'd agree with that, right? We agree. But at this stage of the case, when we read the facts most favorably to our side, a reasonable jury could find that they were being deliberately indifferent. How about with respect to the technician Herrera? So, as previously mentioned by my co-counsel, there's two issues that we see with Herrera. The one issue is that when Mr. Kemple refused to take the lithium carbonate seven times in the month of October, he did not find out the reason as to why, which was direct violation of CDCR policy. And the second issue we have with Herrera is that when Mr. Kemple directly told Herrera that he was suicidal, he did not notify any mental health worker, also in violation of CDCR policy. As noted in this court's case in Vasquez v. County of Kern, this court can look at other non-legal issues to determine whether a reasonable officer would have figured out that their actions were unlawful. And here we believe that knowing that they violated CDCR policy gives rise to the notion that they knew that Herrera's acts were unlawful. And I see that my time is almost up. We just want to emphasize that with here, this clause here does stand on all fours because it really does suggest when looking at the facts of that case that it really applies to a mental health provider who knows that their patient has a substantial risk of suicidality. And here that applies to all four defendants here in this case. And if there's no other questions, we ask this court to affirm the district court's denial of summary judgment and allow this case to continue. Thank you. Thank you. We'll hear from the State. Why don't we put just two minutes on the clock for them. If the court has any questions, I'm happy to answer them. Otherwise, I just have two points to make.  First, for Mr. Beckera, Dr. Martin, and Dr. Kenton, they didn't just interview Mr. Campbell and ignore him and do nothing. Dr. Martin and Dr. Kenton both ordered five-day follow-ups, meaning that for every single day for the next five days, a mental health clinician had to follow up with Mr. Campbell, interview, and assess him. And Beckera, after the third cell extraction, Mr. Beckera placed Mr. Campbell into a crisis bed considering his recent pattern of violent and unpredictable behavior. So this is not a case where they simply listened to him and brushed him off. My second point is to Mr. Herrera. The district court lumped Mr. Herrera in with Beckera, Dr. Martin, and Dr. Kenton when discussing qualified immunity. The court didn't bother to make a factual analysis of the claim against Herrera, and that was critical because the factual basis for the deliberate indifference claim against Herrera is entirely different than a claim against Beckera, Dr. Martin, and Dr. Kenton. And so for that reason, the district court's order should be reversed. Thank you, counsel, and thank you. Thank you to the law school and the clinic. We appreciate the willingness to take on a case. Thank you very much. Excellent job, students, and the clinic. And for the state. And for the state, too. But, I mean... Thank you.
judges: WARDLAW, PAEZ, LEE